## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Northern States Power Company,

                                                    Case No. 11-cv-_____

                    Plaintiff,

v.                                                  **COMPLAINT**

enXco Development Corporation,

                    Defendant.

_____

For its complaint against the defendant, Northern States Power Company alleges as follows:

### INTRODUCTION

1.      This is a case involving two sophisticated companies who negotiated a pair of lengthy and complex contracts governing the construction of a 150-megawatt wind farm to have been located in North Dakota.  Under those contracts, both parties committed to satisfy certain conditions precedent by a contractually set date of March 31, 2011.  The carefully negotiated contract terms allowed either party to terminate the agreements if the other party failed to timely satisfy each of its conditions precedent.

2.      There is no dispute that Defendant enXco Development Corporation ("enXco") failed to timely satisfy each of its conditions precedent.  Specifically, enXco did not timely resolve issues surrounding the impact the wind farm might have (both during

construction and operation) on federally protected avian species, did not timely obtain a site compatibility certificate from the appropriate regulatory body, and did not timely address all land title issues relating to the project site.  As a result, Plaintiff Northern States Power Company ("NSP") terminated the parties' contracts, consistent with its clear contractual rights.

3.     Since the contracts were terminated, enXco has informed NSP that it believes a court will relieve it of the contractual duties it did not fulfill, and has demanded that NSP effectively reinstate those contracts.  There is a present and actual controversy between the parties on the appropriateness of NSP's termination of the parties' contracts.  Accordingly, NSP brings this action for declaratory relief, seeking a declaration that its termination of its contracts with enXco was proper, and that enXco is entitled to no relief from NSP.

## PARTIES

4.     Northern States Power Company ("NSP") is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  NSP is an operating utility primarily engaged in the generation, purchase, transmission, distribution, and sale of electricity in Minnesota, North Dakota, and South Dakota.  NSP provides electric utility service to approximately 1.4 million customers.

5.     enXco Development Corporation ("enXco") is a Delaware corporation with its principal place of business in San Diego, California.  enXco is engaged in the business of wind, solar, and biogas project development, and a premier provider of operation and

maintenance services for the wind, solar, and biogas energy industry throughout North America.

## JURISDICTION

6.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000 (exclusive of interest and costs) and is between citizens of different states, as NSP is a citizen of Minnesota, while enXco is a citizen of both Delaware and California.

## VENUE

7.     This federal District is the proper venue for this action under 28 U.S.C. § 1391(a) because enXco is subject to personal jurisdiction in this District and therefore resides in this District under 28 U.S.C. § 1391(a) & (c), and because a substantial part of the events or omissions giving rise to NSP's claims occurred in this District.

8.     Furthermore, in Section 11.4(c) of the Developed Wind Project Purchase and Sale Agreement (Merricourt Project), dated October 24, 2008 ("PSA"), both parties agreed to "irrevocably submit to the jurisdiction of the federal or state courts located in Hennepin County, Minnesota, over any dispute arising out of or relating to [the PSA] or any of the transactions contemplated" by the PSA.  In the same section of the PSA, the parties further agreed that "[e]ach Party hereby irrevocably waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum."

## FACTS

**A.     The Contracts**

9.      enXco and NSP are parties to two related contracts: 1) the PSA (a true and correct copy of which is attached hereto as Exhibit A), and 2) Amended and Restated Engineering, Procurement and Construction Agreement, dated March 26, 2009 ("EPC Agreement"), a true copy of which is attached hereto as Exhibit B.  (All capitalized terms in this Complaint that are not otherwise defined are defined according to the PSA or the EPC Agreement, as applicable.)

10.     Both contracts relate to a wind farm development project in Dickey and McIntosh Counties in North Dakota ("Merricourt Project" or "project").

11.     As noted in the Recitals to the PSA, enXco was developing the wind farm site so that it could support the installation and operation of 100 wind turbines.  In connection with its development of the site, enXco had acquired certain real-estate rights and other assets and commenced certain development activities.

12.     Under the PSA, NSP agreed to acquire enXco's wind-energy-development assets related to the site, in accordance with the terms and subject to the conditions of the PSA.

13.     As further noted in the Recitals to the PSA, the purpose of the related EPC Agreement was to set forth the terms under which enXco would provide to NSP the engineering, procurement, construction, commissioning, start-up, testing, and project management of the wind-farm project.

4

**B.      The "Long-Stop Date"**

14.      Section 2.3.1 of the PSA provided that the closing of the transactions

contemplated by the PSA (defined as the "Closing") would take place in Chicago "at 9:00

a.m. on a mutually acceptable date within five (5) Business Days following the

satisfaction (or waiver) of the conditions set forth in Article 3 and 4 [of the PSA] . . .

provided, however, that in no event shall the Closing occur later than the Long-Stop

Date" (original emphasis).  Section 1.1 of the PSA defined the term "Long-Stop Date" to

mean March 31, 2011, unless that date was extended to a later date under Section 10.2 or

10.3 of the PSA.  The Long-Stop Date was never extended, and therefore remained at

March 31, 2011.

15.      Section 10.1(a)(i) of the PSA provides that either NSP or enXco could

terminate the PSA prior to the Closing "in the event the Closing has not occurred . . . on

or before the Long-Stop Date" of March 31, 2011.

**C.      Conditions Precedent to NSP's Obligation to Close on the Transactions
         Contemplated by the PSA**

16.      Article 3 of the PSA (entitled "Buyer's Conditions Precedent to the

Closing") provides that NSP's obligation to consummate the transactions contemplated

by the PSA was subject to certain conditions being fulfilled at or prior to Closing, except

to the extent that NSP waived the fulfillment of those conditions in writing.

17.      NSP did not waive the fulfillment of any of the conditions set forth in

Article 3 of the PSA, in writing or otherwise.  Thus, all such conditions were required to

be fulfilled at or prior to the Closing, which, under Section 2.3.1 of the PSA, was to occur

no later than the Long-Stop Date of March 31, 2011.

18.    Section 3.1.6 of the PSA required enXco to deliver or cause to be delivered

to NSP a Permitting Opinion (as that term is defined in Section 2.3.1 of the PSA) on or

before the Project Closing Date.

19.    Section 3.4 of the PSA required enXco to deliver to NSP at or prior to the

Closing true, correct and complete copies of the Reports (as that term is defined in

Section 1.1 of the PSA) in final form, and that those Reports "shall not indicate any

issues, circumstances or conditions that have had or would be reasonably likely to have a

Material Adverse Effect on the Project . . . ."  The term "Material Adverse Effect" is

defined in Section 1.1 of the PSA as "any effect (or effects taken together) that is

materially adverse to the present or future business, operations, assets, liabilities,

properties, results of operations or condition (financial or otherwise) of the Project or the

Property, including the further development, construction or operation of the Facilities

. . . ."

20.    Section 3.5 of the PSA required that there shall have been no Material

Adverse Effect as of the date of the Closing.

21.    Section 3.6 of the PSA required that enXco "shall have performed all

agreements and covenants required hereby to be performed by it prior to, on or as of the

Project Closing Date."

22.    Section 3.6 of the PSA also required that all of enXco's representations and

warranties set forth in Article 6 of the PSA and in any document to be furnished to NSP

under the PSA, or in connection with the transactions contemplated by the PSA that were qualified with respect to materiality, had to be true and correct, and that representations and warranties of enXco that were not so qualified had to be true and correct in all material respects as of the date of the PSA and as of the Project Closing Date.

23.    Section 3.7 of the PSA required that enXco was to deliver each Seller Permit and any Excluded Permit (as those terms are defined in Section 6.11 of the PSA) that Section 3.1.1 required enXco to deliver to NSP had to be in a form and substance reasonably satisfactory to NSP.

24.    Section 3.8.4 of the PSA required that "[w]ithin thirty (30) days after [enXco] has delivered to [NSP] all of the Title Reports required to be delivered pursuant to Section 3.8.2 and the Survey required to be delivered pursuant to Section 3.8.3, [NSP] shall provide [enXco] with a title objection letter . . . setting forth . . . (d) a list of third parties from whom [NSP] requires [enXco] to obtain estoppel certificates, affidavits or consents in a form sufficient to cause the Title Company to remove or to issue an affirmative endorsement against loss arising out of any exception from Schedule B that is not a Permitted Encumbrance ("Curative Documents")."  Section 3.8.4 further states that "[enXco] will use its commercially reasonable efforts to cure each Title Objection and take all commercially reasonable steps required by the Title Company to eliminate each Title Objection as an exception to the Title Reports, or to issue an endorsement to the Title Policy providing affirmative coverage to such exceptions that are the basis for such Title Objection."

**D.    enXco's Representations and Warranties**

25.    Article 6 of the PSA sets forth various representations and warranties that enXco made to NSP as of the date of the PSA and as of the Project Closing Date.

26.    In Section 6.5 of the PSA, enXco represented and warranted that "[o]ther than as described in Schedule 6.5, there are no actions, suits or proceedings pending or, to [enXco's] Knowledge, threatened in writing, against or affecting the Project . . . , at law or in equity or before or by any Authority or instrumentality or before any arbitrator of any kind, and, to [enXco's] Knowledge, there is no valid basis for any such action, proceeding or investigation."

27.    In Section 6.6 of the PSA, enXco represented and warranted that "[o]ther than as set forth on Schedule 6.6, [enXco] has not received any notification indicating any violation of, and there is no violation of, or non-compliance with, any applicable Law, license, franchise, permit, authorization or concession, as such would apply to the Purchased Assets, the Project, or the transactions contemplated hereby."

28.    In Section 6.7(ii) of the PSA, enXco represented and warranted that "[o]ther than as set out in Schedule 6.7:    . . . (ii) [enXco] and its Affiliates have not received any request for information or notice of an alleged violation of Environmental Laws pertaining to the Purchased Assets from any Authority."

29.    In Section 6.7(iii) of the PSA, enXco represented and warranted that "[o]ther than as set out in Schedule 6.7:    . . . (iii) there are no pending claims and, to [enXco's] Knowledge, there are no facts, circumstances, conditions or occurrences

relating to the Purchased Assets that would be expected to form the basis of any such claims, by any Authority under any Environmental Law against [enXco] or its Affiliates."

30.     In Section 6.11 of the PSA, enXco represented and warranted that "Schedule 6.11 of this Agreement is a true and complete list of all Permits needed to complete construction and commence operation of the Project, except for such Permits as are of a type that is routinely granted on application and would not normally be obtained before the commencement of construction."  Part A of Schedule 6.11, in turn, specifies that a Certificate of Site Compatibility from the North Dakota Public Service Commission with respect to the Project is one of the "Seller Permits" described in Section 6.11.

31.     In Section 6.18 of the PSA, enXco represented and warranted that "as of the Project Closing Date the Purchased Assets shall constitute all of the contracts, licenses, permits, approvals and land rights necessary and sufficient for [NSP] to construct and to commence operation of the Project, and no other land rights, permits, approvals or rights will be required in order to construct and to commence operation of the Project."

### E.     Issues Regarding Federally-Protected Avian Species

32.     By letter dated July 8, 2009, the U.S. Fish & Wildlife Service (the "Service") informed enXco that it believed there was a potential for certain protected avian species—specifically, whooping cranes and/or piping plovers—to be present in the Project area.  The Service suggested in this letter that enXco had an option to prepare a Habitat Conservation Plan ("HCP").

33.     enXco was aware that the potential presence of protected avian species in the Project area was a serious issue.  As enXco's Chris Sternhagen noted in an internal enXco memorandum dated September 22, 2009 (the "ITP Recommendation Memo"), if any protected avian species were "taken" (a term that includes harming or killing, but also includes things such as disruption of flight patterns and nesting grounds), the operator of the Project (which, at that juncture, would have been NSP) would face serious civil and criminal penalties under the Endangered Species Act ("ESA") and the Migratory Bird and Treaty Act ("MBTA").

34.     Based on the seriousness of this issue, Sternhagen recommended in the ITP Recommendation Memo that enXco "pursue an HCP and obtain an Incidental Take Permit for the Merricourt Wind Power Project as this action could prove to be the most cost effective and would, without question, be the most environmentally responsible." An Incidental Take Permit ("ITP") is a federally-issued permit that protects project owners from penalties under the ESA if a protected species suffers an incidental take.

35.     Sternhagen informed NSP's Richard Halet by email dated October 13, 2009, that he was recommending that enXco prepare an HCP to study the impact the Project would have on protected avian species and to recommend mitigation steps that could be taken to protect those species.  Sternhagen attached to his October 13 email the internal ITP Recommendation Memo discussed above.

36.     Sternhagen also acknowledged in his October 13, 2009, email to NSP that the Service had told enXco that the risk of a take of a protected species was low, "but that the stakes were high, and I came to the same conclusion prior to my discussion with the

Service."  Sternhagen also stated: "My biggest concern aside from taking one of the birds would be prosecution under the MBTA should a take occur without consideration of species impact during development; the penalties for this are tremendous (see recent PacifiCorp & ExxonMobile [sic] cases)."  The reference to "PacifiCorp & ExxonMobile [sic] cases" was to cases in which companies were severely penalized under the MBTA for taking federally-protected avian species in connection with projects that those companies operated.

37.     In addition, in a November 2009 Avian Assessment and Survey for the Proposed Merricourt Wind Power Project, an enXco consultant (Bob Anderson of North Dakota Birding) noted the potential risks that the Project posed to the whooping crane and piping plover.  Though concluding that the risk of take was low, Anderson stated that "it is possible that the wind farm might incidentally harm or 'take' the piping plover on or near the designated critical habitat."  As a result, Anderson stated, "it is recommended that enXco consider obtaining an incidental take permit from the [Service]."

38.     Despite the recommendations from enXco's own employee Sternhagen and enXco's own consultant North Dakota Birding, enXco did not proceed to prepare an HCP or apply for an ITP.

39.     Because enXco did not proceed to prepare an HCP or apply for an ITP, the Service followed up with enXco by letter dated February 5, 2010, recommending that enXco not begin construction of the Project at issue in this case until it had applied for and received an ITP from the Service.

40.     By letter dated May 10, 2010, NSP notified enXco that it believed the "likelihood of noncompliance with the Endangered Species Act and related statutes," as revealed in the February 5, 2010, letter from the Service, "constitutes an effect that is materially adverse to the present and/or future business, operations, assets, liabilities, properties, results or operations and/or condition (financial or otherwise) of the Merricourt Project, including the further development, construction or operation of the Facilities, or the ability of a Party to perform its obligations under [the PSA] and thereby constitutes a Material Adverse Effect."  This letter further notified enXco that NSP considered enXco in breach of Sections 6.6, 6.7, and 6.11 of the PSA.  NSP requested that enXco provide written confirmation of its intent and ability to cure those breaches.

41.     enXco responded by letter dated May 14, 2010, stating that it disagreed with NSP's analysis and asserting that an ITP was "not required for completion of this project."

42.     On January 25, 2011—after several more letters and meetings between the parties regarding the environmental impact of the Merricourt project—representatives of enXco, NSP, and the Service met to discuss the Merricourt project and its potential impact on protected species.  At or around this time, the Service gave enXco a draft letter in which the Service stated again that it believed the "project site selected has a high potential to adversely affect trust wildlife resources, in particular migratory birds and federally listed species."  This letter also set forth significant substantive comments indicating a general disagreement with an Effect Summary offered by enXco, which had

12

concluded that the potential of a take of the whooping crane or piping plover was minimal and had been avoided by the design of the Project.

43.     Despite the Service's continued concerns and recommendation that enXco prepare an HCP and apply for an ITP, enXco persisted in refusing to do so.

44.     enXco contended in correspondence with both NSP and the Service that despite the recommendations of its employee Sternhagen and its own consultant in the fall of 2009, it believed an HCP and ITP were unnecessary.

45.     At a February 10, 2011, public hearing before the North Dakota Public Service Commission ("PSC"), however, enXco took a new position on the issue.  At that hearing, a member of the PSC asked enXco's representative directly "why [enXco] wouldn't want to go for an incidental take permit."  enXco's representative responded under oath that enXco had not done so because of "the uncertainties that are inherent in the HCP/ITP processes, i.e., through Section 10 and Section 7 consultation."  The PSC member asked for clarification, and enXco's representative (still under oath) stated: "The Fish and Wildlife Service could not assure us of successful completion of these processes in a timely fashion for this particular project."  In other words, by the time enXco thought about the HCP and ITP process and raised the subject with the Service, it might have been too late to obtain the ITP in time to close on the Merricourt project.

46.     Thereafter, in mid-March 2011, less than 20 days before the Long-Stop Date, enXco prepared a Proposed Piping Plover Monitoring Addendum to Biological Conditions and Effects Summary ("Piping Plover Addendum").  In that document, enXco

acknowledged for the first time that it should and would prepare an HCP and apply for an ITP.

47.     In the Piping Plover Addendum, enXco proposes (among other things) significant curtailment of wind-energy-generation activities at the Merricourt site during the spring and fall migratory seasons—perhaps as much as 20% reduction—which curtailment would effectively shut down the wind farm that NSP sought to operate for several weeks each year, during key wind seasons.

**F.     enXco's Failure to Timely Obtain a Site Compatibility Certificate**

48.     In Part A of Schedule 6.11 to the PSA, enXco identified a Certificate of Site Compatibility from the PSC as one of the required Seller Permits.

49.     Under the terms of the PSA, enXco was required to obtain the Certificate of Site Compatibility on or before the Long-Stop Date of March 31, 2011.

50.     enXco failed to do so, and has publicly admitted that its failure to do so gave NSP the contractual right to terminate the PSA.

51.     Specifically, at a March 18, 2011, special meeting of the PSC, which was held solely to consider enXco's request for an expedited hearing before March 31 at which the PSC would hear and decide enXco's application for a Certificate of Site Compatibility, enXco's counsel informed the PSC that enXco was seeking an expedited hearing because "we do have contractual obligations with our off taker, NSP, that will put the project in serious jeopardy of going forward, essentially if we are not able to meet our obligations by March 31st." When a PSC member suggested that a delay in hearing the request would not really pose that great a risk to the project, and sought enXco's

comment on that, enXco's counsel cautioned that "<u>NSP would have the contractual ability to terminate April 1 and there's nothing that we can do as enXco to prevent that</u> . . . other than come before you and do everything we can to get the hearing expedited" (emphasis added).

52.     The PSC ultimately denied enXco's request to expedite the hearing and hold it before March 31, 2011.  One of the reasons the PSC gave for not expediting the hearing at which enXco's application could be heard was concern regarding treatment of protected species.  As one member of the PSC noted at the March 18, 2011, special meeting: "By us moving it [the meeting at which the enXco application would be heard] up, that implies that we're going to approve it and I'm still waiting for some information on the whooping crane data and there's other things out there that I'm not sure that moving this forward is the right thing."

53.     Despite the comments from enXco's counsel at the March 18, 2011, meeting acknowledging that enXco is ultimately responsible for obtaining the Certificate of Site Compatibility on or before March 31, 2011, enXco has since informed NSP that it believes it should be excused from the PSA's obligation to obtain the Certificate of Site Compatibility on or before March 31, 2011, because in its view it is not enXco's fault that it could not obtain the Certificate by that date.

54.     Whatever issues existed in scheduling an earlier hearing at which enXco's application could be considered, this does not shift the contractual responsibility for timely obtaining the Certificate of Site Compatibility from enXco to NSP.

**G.     enXco's Refusal to Secure Consents as Requested by NSP**

55.     Under Section 3.8.4 of the PSA, NSP provided to enXco a November 30, 2010, Title Objection Letter.

56.     In that letter, NSP noted that Section 3.8.4 of the PSA requires Buyer (NSP) to list the third parties from whom Buyer would require Seller (enXco) to obtain estoppels certificates, affidavits, or consents.  NSP stated in the letter that it would require "consents be obtained from all parties holding easement rights as well as from tenants and facility operators."

57.     Among the consents that NSP identified in its Title Objection Letter was consent from the Service to the Project's impact to lands subject to certain conservation easements in favor of the Service.  In addition, NSP requested that enXco obtain confirmation from the Service of enXco's wetlands delineation as one of the "Curative Documents" to be sought and delivered under Section 3.8.4.

58.     enXco refused NSP's requests, because seeking the consent from the Service would have established a federal nexus that would have required that the Service formally review the Project for impacts to protected wildlife (something that enXco was trying to avoid).  Instead, enXco—without first seeking NSP's approval—sought and obtained from the Service a "concurrence letter."

59.     The concurrence letter is insufficient to satisfy enXco's obligations under Section 3.8.4 of the PSA, because (among other reasons):  (1) it could not be recorded and thus would not run with the land; (2) it does not acknowledge that third parties (like NSP) could rely on the letter; and (3) it does not address set-backs from protected

16

wetland areas, which could require further permitting in the future if any Project facilities were to require repair or replacement in an area beneath a protected wetland.

### H.     NSP's Termination of the PSA and EPC Agreement

60.     Under Section 10.1(a)(i) of the PSA, either party may terminate the PSA "in the event the Closing has not occurred or the conditions precedent to Closing in favor of the terminating Party have not been fulfilled or waived on or before the Long-Stop Date."

61.     Both such conditions occurred here—that is, the Closing did not occur on or before the Long-Stop Date—indeed, enXco did not even attempt to close by the Long-Stop date—and several conditions precedent to Closing in favor of NSP were not fulfilled or waived on or before the Long-Stop Date.

62.     Accordingly, NSP sent to enXco on April 1, 2011 (the day following the Long-Stop Date), a notice of termination.  A true and correct copy of the notice of termination is attached hereto as Exhibit C.

63.     In the notice of termination, NSP identified several bases for terminating the PSA, including:

    a.  The Closing did not occur as of March 31, 2011.

    b.  enXco's failure to fully resolve the Service's concerns regarding protected species, as well as the proposed curtailment of operations during the spring and fall migratory seasons, constitute a Material Adverse Effect that was not cured by March 31, 2011, in violation of Section 3.5 of the PSA.

17

c.  Certain avian surveys provided to NSP as a Report under Section 3.4 of the PSA indicated that a take of piping plovers was likely to occur as a result of construction and operation of the Project, thus confirming that an ITP was required; these surveys thus indicated an issue that, contrary to Section 3.4 of the PSA, has "had or would be reasonably likely to have a Material Adverse Effect on the Project."

d.  The Service's repeated advisories to enXco that the potential take of both the whooping crane and the piping plover would violate federal statutes and ultimately subject NSP to civil and criminal penalties rendered the representations and warranties in Sections 6.5, 6.6, 6.7(ii), and 6.7(iii) false, such that the condition precedent in Section 3.6 of the PSA 3.6 requiring that all representations and warranties be true in all material respects was not satisfied as of March 31, 2011.

e.  The Service's advisories as discussed in paragraph (d) above, as well as the acknowledgement in the avian surveys discussed in paragraph (c) above and the acknowledgement in enXco's proposed Addendum to its Effects Summary, all establish that an ITP is a necessary permit for the Project; the failure to include the ITP on Schedule 6.11 or to obtain an ITP by March 31, 2011, violated Sections 3.1.6, 3.6, and 6.1 of the PSA.

f.  enXco's failure to obtain the Certificate of Site Compatibility by March 31, 2011, violated Sections 3.6, 6.11(a), and 3.7 of the PSA.

g.  enXco's failure to obtain the Certificate of Site Compatibility and an ITP by March 31, 2011, also violated Sections 3.6 and 6.18 of the PSA.

h.  enXco's failure to seek and obtain consents from the Service relating to certain easements, and to seek confirmation from the Service of enXco's wetlands delineations, violated Sections 3.8.4 and 5.3 of the PSA.

64.  In accordance with Section 13.8.2 of the EPC Agreement, NSP also terminated that Agreement as of April 1, 2011.

## COUNT ONE
## Declaratory Judgment

65.  NSP is entitled, under Minn. Stat. § 555.01 *et seq.*, the Declaratory Judgment Act (and in particular under Minn. Stat. § 555.02, which states that "[a]ny person interested under a . . . written contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status, or other legal relations thereunder"), and under 28 U.S.C. §§ 2201 and 2202, to a declaration of its right to have terminated the PSA and the EPC Agreement under Section 10.1(a)(i) of the PSA and Section 13.8.2 of the EPC Agreement.

66.  NSP is a "person interested" under written contracts, namely the PSA and EPC Agreement.

67.  NSP seeks to have determined a question of construction under those contracts—namely, whether its termination of the contracts under the above-cited provisions was proper, and consistent with the terms of the contracts.

68.     NSP further seeks to obtain a declaration of its rights, status or other legal relations under the PSA and EPC Agreement—namely, NSP seeks a declaration that it properly terminated those contracts and that the parties have no further rights under those contracts (except to the extent any of the provisions survive termination).

69.     enXco asserts that the termination of the contracts under the above-cited provisions was improper, and has threatened NSP with legal action unless NSP agrees to reinstate the contracts in some fashion.

70.     This ongoing dispute has caused tremendous uncertainty for NSP, resulting in harm to NSP.

71.     Thus, a justiciable controversy exists:  NSP's claim (a) involves a definite and concrete assertion of rights emanating from one or more legal sources; (b) involves a genuine conflict in tangible interests between parties with adverse interests; and (c) is capable of specific resolution by judgment rather than presenting hypothetical facts that would form an advisory opinion.  Further, this controversy is causing NSP direct and immediate injury.

72.     The Court should settle this controversy and afford relief from uncertainty and insecurity by granting a judicial decree stating that NSP's termination of the PSA and EPC Agreement under the above-cited provisions was proper and did not constitute a breach of those agreements that would justify either equitable or monetary relief for enXco.

## **RELIEF REQUESTED**

WHEREFORE, NSP respectfully requests as follows:

20

1.    The Court determine and declare:

   a.  that NSP's termination of the PSA under Section 10.1(a)(i) thereof, and

       its termination of the EPC Agreement under Section 13.8.2 thereof,

       were proper;

   b.  that enXco is entitled to no equitable, monetary or other relief as a result

       of the termination of those agreements; and

   c.  that the parties have no further rights and obligations under the PSA and

       EPC Agreement, except to the extent any of the provisions thereunder

       survive termination of the contracts.

2.    The Court award NSP appropriate fees and costs incurred in bringing this

motion (including attorneys' fees).

3.    The Court enter an order directing all other equitable and legal relief to

which NSP may be entitled.


Dated: _____, 2011          **FAEGRE & BENSON LLP**


                                        s/Charles F. Webber_____
                                        Charles F. Webber (#215247)
                                        Deborah A. Ellingboe (#26216X)
                                        2200 Wells Fargo Center
                                        90 South Seventh Street
                                        Minneapolis, Minnesota 55402-3901
                                        (612) 766-7000

                                        Attorneys for Plaintiff
                                        Northern States Power Company

fb.us.6326982.02